IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSÉ LUIS CRISANTO-VALENTIN, RAUL BARONA-CISNEROS, LUIS ENRIQUE GARCIA-VICENCIO, RAFAEL HERNANDEZ-NORBERTO, RODOLFO SOBREVILLA-PEÑA, and GAVALIER PEREZ-GARCIA, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 7:19-cv-90-BO |
| JACKSON'S FARMING COMPANY OF AUTRYVILLE and WILLIAM RODNEY JACKSON, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## AMENDED COMPLAINT

Pursuant to Fed.R.Civ.P. Rule 15(a)(1)(B), the Plaintiffs file and serve their Amended Complaint. *See Concordia Pharms., Inc. v. Kelley*, C.A. No. 6 :18-704-HMH, 2018 U.S. Dist. LEXIS 101194 (D.S.C. filed June 18, 2018).

I.      PRELIMINARY STATEMENT

1.      Through this action, six migrant Plaintiffs seek damages and other relief to redress the sustained and unlawful efforts of Defendants Jackson's Farming Company of Autryville (JFC) and William Rodney Jackson to deny them their rights to insist on compliance with statutes and regulations intended to safeguard the health and well-being of Plaintiffs, and to collectively act and bargain for improvements at their workplace.  The Plaintiffs request relief for the Defendants' retaliation against them for exercising rights guaranteed them by federal and state law.

2.      Plaintiffs José Luis Crisanto-Valentin, Raul Barona-Cisneros, Luis Enrique Garcia-Vicencio, Rafael Hernandez-Norberto, Rodolfo Sobrevilla-Peña, and Gavalier Perez-Garcia are migrant agricultural workers recruited by the Defendants' authorized agents in Mexico in 2017 to work under the H-2A guestworker program on the Defendants' farm, in and around Sampson County, North Carolina.  The Plaintiffs file this action under the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C.Gen.Stat. §§ 95-240 *et seq.* and the statutory right of action codified in N.C.Gen.Stat. §§95-78, 95-81 and 95-83.  The Plaintiffs also file this action against JFC to recover damages for JFC's violations of federal regulations at 20 C.F.R. §655.135(e) and 655.135(h)(5), that were incorporated into the Plaintiffs' employment contracts.

3.      The Plaintiffs' statutory claims are based on the Defendants' violations of N.C. Gen.Stat. §§95-241(a)(1)b., 95-241(a)(2), and 95-241(a)(3) of the REDA, the Defendants' violations of N.C. Gen.Sat. §§95-78, 95-81, and 95-83, and the Plaintiffs' statutory rights detailed in N.C.Gen.Stat. §§ 95-78, 95-126(b)(1), 95-126(b)(2)a., 95-126(b)(2)b., 95-126(b)(2)d., 95-126(b)(2)g., 95-126(b)(2)h., 95-126(b)(2)i., and 95-155 of the Occupational Safety and Health Act of North Carolina ("OSHANC").  These claims stem in part from the Defendants' November, 2017 wrongful, discriminatory, and retaliatory suspension of the Plaintiffs, as well as the Defendants' refusal to re-employ the Plaintiffs in subsequent agricultural seasons.  The Defendants' actions were motivated solely by their desire to retaliate against or blacklist the Plaintiffs for exercising their rights to become and act collectively as  members of a labor organization under the North Carolina Right to Work statute to file, report, and provide in good faith information in support of a written complaint that the Defendants violated North Carolina's OSHA field sanitation and drinking water standards.

- 2 -

3A.     In the first alternative, the moving cause for the Defendants' blacklisting and retaliation against the Plaintiffs by suspending them on November 8, 2017 and refusing to rehire them to perform any agricultural work under the H-2A program in any year after 2017was because of the Plaintiffs' collective exercise of their rights as union members under the North Carolina Right to Work statute and/or N.C.Gen.Stat. §§ 95-241(a)(1)b., 95-241(a)(2), and/or 95-241(a)(3).  In the second alternative, a determining or motivating factor in the Defendants' blacklisting and retaliation against the Plaintiffs by suspending them on November 8, 2017 and refusing to rehire them to perform any agricultural work under the H-2A program in any year after 2017 was the Plaintiffs' collective exercise of their rights under N.C.Gen.Stat. §§ 95-78, 95-81, and 95-241(a)(1)b., 95-241(a)(2), and/or 95-241(a)(3).

4.     The Plaintiffs request actual, incidental, consequential, compensatory, and other damages under the common law of North Carolina, including punitive damages, and all statutory relief authorized by N.C.Gen.Stat. §§ 95-83 and 95-243(c), pre- and post-judgment interest, and declaratory and injunctive relief as set out herein.

II.     <u>JURISDICTION</u>

5.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§1332 and 1367(a). Each of the of the Plaintiffs is a citizen of the Republic of Mexico, the Defendants are citizens of North Carolina, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, for each of the Plaintiffs' claims under REDA and Article 10 of Chapter 95 of the North Carolina General Statutes alleged in the First and Second Claims for Relief of this Complaint. The Plaintiffs' statutory claims under N.C.Gen.Stat. §§ 95-78, 95-81, and 95-83, and their common law contract claims are all part of the same case or controversy as the Plaintiffs' REDA claims, as they derive from a common nucleus of operative fact and are such that the Plaintiffs would

- 3 -

ordinarily be expected to try them all in one judicial proceeding. All of these claims concern the Defendants' retaliatory suspension and termination of the Plaintiffs' employment and their refusal to re-employ the Plaintiffs in subsequent agricultural seasons.

6. The amount of lost wages at issue for each Plaintiff for the Defendants' violations of N.C.Gen.Stat. §§ 95-241, 95-78, and 95-81 is in excess of $13,000 for both calendar year 2018 and 2019. Because the Defendants' violations were willful and intentional, the Plaintiffs are entitled to treble damages pursuant to N.C.Gen.Stat. § 95-243(c), increasing their individual damages from $26,000 to $78,000. Each Plaintiff also is entitled to recover lost wages in excess of $26,000 pursuant to N.C.Gen.Stat. § 95-83. In addition, each Plaintiff seeks an award of compensatory damages under N.C.Gen.Stat. § 95-83 in an amount to be determined by the jury, but in excess of $30,000 for the emotional distress caused by the Defendants' actions in violation of N.C. Gen. Stat. §§ 95-78 and 95-81. Finally, pursuant to N.C. Gen.Stat. § 95-83, each Plaintiff seeks an additional award of punitive damages in an amount to be determined by the jury but in excess of $30,000 based on the Defendants' willful conduct in reckless disregard of his rights under N.C.Gen.Stat. §§ 95-78 and 95-81.

7. Defendant Jackson's Farming Company of Autryville (JFC) has been incorporated in and has as its principal place of business in North Carolina.

8. This Court has the power to grant declaratory relief pursuant to 28 U.S.C. §§2201 and 2202.

III. VENUE

9. Venue is proper in this district pursuant to 28 U.S.C. §§1391(b)(1), 1391(b) (2) and 1391(d). The Defendants are residents of this district and the events giving rise to this action occurred within Sampson County, North Carolina.

- 4 -

IV.    NAMED PLAINTIFFS

10.    José Luis Crisanto-Valentin, Raul Barona-Cisneros, Luis Enrique Garcia-Vicencio, Rafael Hernandez-Norberto Rodolfo Sobrevilla-Peña, and Gavalier Perez-Garcia ("the Plaintiffs") are citizens of Mexico.  In 2017, the Defendants chose the Plaintiffs to work for them in North Carolina on temporary H-2A visas pursuant to 8 U.S.C. §1101(a)(15)(H)(ii)(a) to perform agricultural labor exclusively for JFC during 2017.  At all times relevant to this action, each of the Plaintiffs was and continues to be a member in good standing of the Farm Labor Organizing Committee, AFL-CIO ("FLOC"), a "labor organization" and "labor union" within the meaning of N.C.Gen. Stat. § 95-81.

10A.    In 2014, 2015, and 2016, Defendants chose Plaintiff Gavalier Perez-Garcia to come to North Carolina on an H-2A visa to work exclusively for them in each of those same years. For the separate agricultural seasons that occurred in each of those same calendar years, Plaintiff Perez-Garcia successfully completed and competently performed the agricultural work called for by his H-2A job contract with the Defendants, and timely returned to Mexico at the end of each of those three H-2A job contracts.

10B.    For the agricultural season that occurred in calendar year 2016, the Defendants chose Plaintiff Luis Enrique Garcia-Vicencio to come to North Carolina to work exclusively for them on an H-2A visa during that same year.  In that same year and season, Plaintiff Garcia-Vicencio successfully completed and competently performed the work called for by his H-2A job contract with the Defendants, and timely returned to Mexico at the end of the 2016 H-2A contract.

10C.    Because of that successful completion and competent performance, the Defendants recruited and rehired Plaintiffs Perez-Garcia and Garcia-Vicencio for H-2A employment in each of the years following each such Plaintiff's first year of H-2A employment by the Defendants.

- 5 -

V.    DEFENDANTS

11.    Defendant Jackson's Farming Company of Autryville ("JFC") is a closely-held North Carolina corporation in good standing duly formed on September 14, 1981 under and in accordance with the laws of the State of North Carolina.  At all times relevant to this Complaint, William Brent Jackson served as either the President or chairman of the board of Defendant JFC. At all times relevant to this Complaint, Defendant William Rodney Jackson served as the President, Vice President and/or chief executive officer of Defendant JFC.

12.    Upon information and belief, William Brent Jackson and his son, Defendant William Rodney Jackson are the sole owners of Defendant JFC.

VI.    FACTUAL ALLEGATIONS

**The H-2A Program**

13.    An agricultural employer may import aliens to perform labor of a temporary nature if the U.S. Department of Labor ("DOL") certifies that there are insufficient available workers within the U.S. to perform the job and the employment of aliens will not adversely affect the wages and working conditions of similarly-situated U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) and 1188 (a)(1). Aliens admitted to perform temporary agricultural work in this fashion are commonly referred to as "H-2A workers."

14.    Under the terms of their visas, H-2A workers are not permitted to change employers and may work only for the agricultural employer or agricultural association which applies for their admission.

15.    A grower seeking to import H-2A workers may apply in its individual capacity or as part of an agricultural association.   Agricultural associations serving as joint employers of the

- 6 -

H-2A workers may file a master application on behalf of its employer-members who offer comparable work. 20 C.F.R. §655.131(b).

16. Agricultural employers seeking the admission of H-2A workers from Mexico, including agricultural employers seeking workers as members of a joint employer agricultural association, must first file a temporary labor certification application with DOL. The application must include a job offer, commonly referred to as a "clearance order" or "job order," complying with applicable regulations. Federal regulations establish the minimum benefits, wages, and working conditions that must be offered by the petitioning employer to ensure that the employment of H-2A workers will not adversely affect the wages and working conditions of workers in the U.S. similarly employed. 20 C.F.R. § 655.100(b). In order to ensure that this is the case, the DOL has determined that all agricultural employers who desire to obtain the DOL certification required to obtain authorization to employ H-2A workers must provide the minimum wages and working conditions detailed in 20 C.F.R. §§ 655.122 and 655.135 and 29 C.F.R. §§ 501.4(a) and 501.5. Among these terms included in the job offer are the following:

> (a) During the period of employment, the employer must comply with all applicable Federal, State and local laws and regulations, including health and safety laws. 20 C.F.R. §655.135(e); and

> (b) The employer will not intimidate, threaten, restrain, coerce, blacklist, or discharge or in any manner discriminate against any person who has exercised or asserted on behalf of himself or others of any right or protection afforded by the H-2A regulations. 20 C.F.R. §655.135(h) and 20 C.F.R. §501.4(a).

17. Subject to the limitations imposed by the anti-discrimination, anti-blacklisting, and anti-retaliation employment law provisions of federal, state, and local law as well as the limitations imposed by the contractual protections contained in clearance order contracts,

selection of individuals to receive H-2A visas to be issued as a result of DOL's certification of employer need to import workers is within the unfettered discretion of the employer.

17A.    For H-2A employers like JFC, the limitations imposed by the employment law provisions of North Carolina law includes the provisions of N.C.Gen.Stat. §§ 95-78, 95-81, and 95-241.

17B.    When an employer (like JFC) is certified by DOL to import H-2A workers, that employer then selects a worker(s) to receive an H-2A visa.  In order to do so the employer completes and submits to the U.S. Department of Homeland Security Citizenship and Immigration Service (CIS) office an I-129 form Petition for a Nonimmigrant Worker.  Pursuant to that Petition and selection, individuals like the Plaintiffs then, with the assistance and at the direction of agents designated by JFC and other H-2A employers like JFC operating in Mexico and elsewhere  complete a detailed online application with the United States Consulate. . Upon payment of the required fees, employer agents arrange for the H-2A workers they have selected to be interviewed by a United States consulate with respect to their eligibility for admission as a nonimmigrant H-2A worker.  If the consulate determines the Plaintiff or other worker is eligible for admission as a nonimmigrant, the individual designated by employers like JFC is issued an H-2A visa for the job period specified in the employer's H-2A certification.

17C.    The H-2A worker chosen by the employer then proceeds to the U.S.-Mexico border where an individual employed by the U.S. Department of Homeland Security Customs and Border Protection applies the same eligibility standards for admission to the H-2A worker that the U.S. Consulate applied to determine whether the H-2A worker with an approved H-2A visa and valid Mexican passport should be allowed to enter the United States to perform the work that the H-2A worker has been authorized to perform by the U.S. Consulate and the DOL.

- 8 -

H-2A workers with authentic H-2A visas and valid Mexican passports who have completed the process described in paragraphs 16 and 17B above who present themselves at the U.S./Mexico border within a few days after the start date of their H-2A visas are invariably allowed to enter the United States.

**The 2014 North Carolina agricultural season and before**

18.     In order to obtain agricultural labor for its operations for the 2014 North Carolina agricultural season and in all of the agricultural seasons from at least 2004 until 2014, JFC chose and employed H-2A workers either directly on its own or through the North Carolina Grower's Association, Inc. (hereinafter "NCGA").  The NCGA is a non-profit member association of more than 500 individual agricultural producers doing business in North Carolina.  During 2014, JFC was an employer-member of the NCGA.  In 2014, JFC's request for H-2A workers was included as part of a master application filed by the NCGA on behalf of JFC and a number of its other employer-members.  The master application contained the job terms required by the federal H-2A regulations, including those described in Paragraph 16.

19.     H-2A workers employed or jointly employed by the NCGA during 2014, including those H-2A's employed on JFC's operations, were covered by a collective bargaining agreement ("CBA") between the NCGA and the Farm Labor Organizing Committee, AFL-CIO ("FLOC").

20.     In or about June 2014, FLOC members employed on JFC's operations filed a grievance against the farm under the CBA, contending that JFC was under-reporting their hours of work as a result of inappropriate clock-out procedures.   As a result of these timekeeping practices, the H-2A workers employed on JFC's operations were paid less than the adverse effect wage rate for their labor, in violation of the H-2A regulations. After an extensive investigation

- 9 -

and lengthy negotiations, the claim was settled in September, 2014, with the H-2A workers receiving back wages as a result.

**The 2015 North Carolina agricultural season**

21.     Unhappy with the 2014 complaint filed against it under the CBA and hoping to avoid further worker oversight of its employment practices, JFC left the NCGA in 2015. Beginning in 2015, JFC continued to obtain most of its workforce through the H-2A program, but rather than seeking authorization to import foreign workers through the NCGA, JFC filed its own separate temporary labor certification application.  Because it no longer applied for H-2A workers through the NCGA, JCF was not bound to the terms of the CBA between the NCGA and FLOC.

22.     In or about April, 2015, JFC filed an application with the DOL seeking certification to import 43 H-2A workers for employment from June 11 through December 2, 2015.  As part of this application, JFC agreed to comply with applicable H-2A regulations, including those described in Paragraph 16.   The clearance order submitted as part of the application included a certification that it described the actual terms and conditions of the employment being offered.  This certification was signed on behalf of JFC by Defendant William Rodney Jackson.  On April 28, 2015, the DOL granted JFC's temporary labor certification application .

23.     When H-2A workers arrived at the JFC farm in June, 2015 to begin work, they were informed by JFC representatives that there was no longer a union on the farm, and that the union only caused problems in the past.

24.     The systemic timekeeping problems that gave rise to the 2014 NCGA complaint described in Paragraph 20 persisted in 2015.  However, out of fear of retaliation by JFC, no

- 10 -

employees took action regarding these timekeeping problems and resulting wage underpayments until the very end of the agricultural season.

25.     On December 16, 2015, seven workers presented a range of wage-related complaints to the Defendants that included, among others, the failure to record work hours correctly.  When these issues could not be informally resolved, these workers filed suit against JFC in federal court on February 23, 2016.  *See Sanchez-Rodriguez v. JFC*, Case No. 7-16-cv-28-D (E.D.N.C.)   In their federal court action, the plaintiff H-2A workers complained of JFC's' failure to pay wages mandated due under N.C.Gen.Stat. § 95-25.6 of the North Carolina Wage and Hour Act.

26.     None of the plaintiffs in the *Sanchez-Rodriguez* case was offered employment by the Defendants for the 2016 agricultural season.  As a result of this decision by the Defendants to not renew any the H-2 employment contracts for the *Sanchez-Rodriguez* plaintiffs, those plaintiffs amended their complaint to include claims of retaliation and discrimination in violation of N.C.Gen.Stat. §§ 95-241(a)(1)b., 95-241(a)(2), and 95-241(a)(3).  After protracted legal maneuvering and a public relations campaign by FLOC, the claims were settled in November, 2016.

**The 2017 North Carolina agricultural season**

27.     From 2016 through 2019, JFC annually applied for temporary labor certification to import 95 H-2A workers annually for employment on its operations from February through December.   Each of these applications was approved and certified by the DOL.

28.     In selecting individuals to receive H-2A visas for the 2016, 2017, 2018 and 2019 agricultural seasons, the Defendants actively sought to avoid hiring persons who were known to be union members.    In both 2016 and 2017, JFC's representatives informed its H-2A workers

- 11 -

that the company did not want union members as its employees and specifically did not want its employees represented by FLOC.

29.    JFC's application for H-2A workers for the 2017 agricultural season, filed in December, 2016, requested the admission of 95 workers for employment from February 25 through December 15, 2017.   As part of this application, JFC contracted to comply with applicable H-2A regulations and North Carolina employment statutes, including those described in Paragraphs 16 and 17A.   The clearance order submitted as part of the application included a certification that it described the actual terms and conditions of the employment being offered. This certification was signed on behalf of JFC by Defendant William Rodney Jackson.  On January 20, 2017, the DOL granted JFC's temporary labor certification application.

30.    Using that DOL certification, JFC filed a Form I-129 Petition for a Nonimmigrant Worker with the U.S. Customs and Immigration Service (USCIS) in which JFC named each Plaintiff and other Mexican nationals that it, acting with the assistance of JFC's agents located both in the United States and in Mexico, had chosen to employ under the H-2A program in 2017. After the USCIC approved JFC's Form I-129 Petitions, JFC's agents, including a Mr. Gonzalez Solis in Tlaxcala, assisted Plaintiff Perez-Garcia, the other Plaintiffs, and the other nonimmigrant Mexican nationals that JFC had chosen to complete an online Nonimmigrant Visa Application Form DS-160 on the date specified by JFC's agents so that the Plaintiffs could arrive in North Carolina to start work in 2017 on the date chosen by the Defendants.  Those same JFC agents also obtained visa interview appointments for the Plaintiffs and those other Mexican nationals named in its approved I-129 Petition at a U.S. Consulate in Monterrey, Mexico chosen by JFC and its agents and made the necessary arrangements with the Plaintiffs and those other Mexican nationals that had been recruited by JFC's agents to fill the manpower requirements described in

- 12 -

JFC's 2017 temporary labor certification application for hotel or hostel arrangements in Monterrey while they waited in Monterrey to appear in a timely manner for those interviews. After being issued H-2A visas as a result of JFC's arrangements and successfully completing their visa interview at the U.S. Consulate in Monterrey, Mexico, the Plaintiffs and their H-2A co-workers traveled to the U.S. /Mexico border and then to North Carolina by bus transportation arranged by the Defendants and/or their agents in Mexico and the United States. On their way north, the Plaintiffs and those worker went through another interview by an U.S. Border Patrol official at the U.S./Mexico border using the same criteria that the Consular official had just used, entered the United States, and went to work on JFC's operations in and around Sampson County, where they were housed in one of JFC's farm labor camps. Some of the Plaintiffs began work for JFC in or about March, 2017 and some as late as June 2017.

31. Throughout the period they worked on JFC's operations in 2017, the Plaintiffs were jointly employed by Defendants JFC and William Rodney Jackson for purposes of the REDA, the OSHANC and the regulations governing the H-2A program. Defendant William Rodney Jackson maintained day to day operational control over the Plaintiffs' employment, possessing and exercising the power to direct the Plaintiffs as to when, where, and how they were to perform their assigned tasks. William Rodney Jackson also possessed and exercised the power to make work assignments to the individual Plaintiffs and to determine the rate of pay and method by which they were paid..

32. In or about June, 2017, William Brent Jackson, co-owner of JFC and chairman of its board of directors, in his capacity as a North Carolina state senator, sponsored legislation in the state General Assembly intended to stop workers from forming and joining agricultural unions to enforce their rights under federal and state law. The legislation was passed by the

General Assembly and signed by the governor. N.C.Gen.Stat. §95-79(b). Implementation of the statute was later preliminarily enjoined by a federal court. *FLOC v. Stein*, No. 1:17-cv-1037, 2018 WL 3999638, 2018 U.S. Dist. LEXIS 141535 (M.D.N.C. Aug. 21, 2018), Report and Recommendation adopted by Order filed September 20, 2018.

33. Throughout the entire 2017 North Carolina agricultural season, each of the Plaintiffs performed his respective job duties for JFC in a competent and professional manner and in conformance with the requirements of his employment contract. None of the Plaintiffs was ever cited in writing for any disciplinary infraction or violation of JFC's employee rules.

34. During the latter part of the 2017 agricultural season, the Plaintiffs and some of their co-workers decided to collectively provide information to JFC about ongoing violations of their employment contracts, including JFC's failure to provide an adequate supply of drinking water while they were working in the field. The Plaintiffs and those workers also collectively provided information about abuse by their supervisors, extended periods of little or no work, lack of job security and inadequate notice of the daily starting time for work. All of the Plaintiffs and a majority of JFC's H-2A workers signed union cards with FLOC, seeking to bargain collectively with JFC regarding these problems.

35. Starting with a written request on October 23, 2017, FLOC representatives made repeated requests to JFC to meet and provide information to the Defendants about the workers' problems, including the inadequate supply of drinking water. That written request included a statement that the Plaintiffs and the majority of the other H-2A workers that the Defendants employed had signed union cards authorizing FLOC as their bargaining agent. The FLOC representatives received no response to these requests from JFC or its representatives.

- 14 -

36.     In early November, 2017, the Plaintiffs and co-worker José Rodriguez-Graciano were elected by the JFC union members to serve as a FLOC union negotiating committee. All seven negotiating committee members signed a November 8, 2017 letter to JFC. The November 8 letter informed JFC that as FLOC union members and duly-elected representatives of their co-workers, they wished to meet with and provide information to the Defendants about the workers' problems with JFC as part of the Plaintiffs' good faith provision of information to JFC about the inadequate access to drinking water in the fields, as required by 29 C.F.R. § 1928.110(c)(1)(i)-(ii).

36A.    On November 7, 2017, the Plaintiffs requested and obtained permission from their supervisor, Rosalino Hernandez-Montes, for time off work the following morning to present the November 8 letter to the Defendants. That permission included an arrangement with their supervisor that the Plaintiffs should let their supervisor know when the plaintiffs had completed their meeting on November 8 with the Defendants so that their supervisor could provide the transportation necessary to transport the Plaintiffs to work for the rest of the day on November 8.

37.     On November 8, the negotiating committee members, including the Plaintiffs, went to the JFC office along with two FLOC representatives, seeking to deliver the November 8 letter. Employees in the JFC office informed the negotiating committee members that Defendant William Rodney Jackson would not speak with them and that non-employees of the farm, including the FLOC representatives, were not permitted to remain on JFC's premises, including the labor camp facilities in which the Plaintiffs were residing under the terms of their contract with JFC.

38.     Following their unsuccessful efforts to meet with and provide information to Defendant William Rodney Jackson, the negotiating committee members notified their

- 15 -

supervisor that they were ready to return to work for the rest of the day through the transportation promised by their supervisor the day before, and then returned to their living quarters at the farm labor camp housing with two FLOC representatives to discuss the events of the morning while they were waiting for their supervisor to arrive with the necessary and available vehicle to transport them to work for the rest of the day as they had arranged the day before. Several JFC supervisory employees followed the group to the workers' living quarters, where they informed the Plaintiffs and the FLOC representatives that the farm labor camp housing was JFC property and that the Plaintiffs were not permitted to have unapproved visitors such as FLOC representatives.

39.     After completing their brief meeting at the camp, the Plaintiffs continued to wait at their farm labor camp housing so that they could return to the jobsite to begin work for the day. Acting in concert with one another, the Defendants did not permit the Plaintiffs to work the rest of that workday, resulting in each of them losing approximately $100 in wages. The Defendants' refusal to allow the Plaintiffs work for the rest of the November 8 workday resulted solely from the Plaintiffs' collective exercise as FLOC members of their rights under the OSHANC and N.C.Gen.Stat. §§ 95-78, 95-81, and 95-241.

39A.    In the first alternative, the moving cause for the Defendants' refusal to allow the Plaintiffs to return to work for the rest of the November 8, 2018 workday was the Plaintiffs' collective exercise as FLOC members of their rights under the OSHANC and N.C.Gen.Stat. §§ 95-78, 95-81, and 95-241. In the second alternative, a determining or motivating factor for the Defendants' refusal to allow the Plaintiffs to return to work for the rest of the November 8, 2018 workday on November 8 was the workers' collective exercise as FLOC members of their rights under the OSHANC and N.C.Gen.Stat. §§ 95-78, 95-81, and 95-241.

- 16 -

**The 2018 and 2019 North Carolina vegetable seasons**

40.    Despite the problems encountered in 2017, each of the Plaintiffs wished and was ready, willing and able to return as an H-2A worker for employment at JFC for the 2018 and 2019 North Carolina agricultural seasons, and for the seasons following 2019.  For both 2018 and 2019, the Plaintiffs had and still have valid Mexican passports, and were, are and will be prepared to cooperate with the Defendants or their designated agents in the same way that they did in 2017 and in years before  to apply for and  obtain H-2A visas from the U.S. Consulate in Monterrey, Mexico or such other designated location of the U.S. Consulate for those same years and seasons.

40A.    Other than the complaints they made in North Carolina in 2017, the Plaintiffs have not experienced any change in any events, occurrences and circumstances relevant to their employment in the United States by JFC. At all relevant times, they have been and remain eligible for employment by Defendants pursuant to H-2A visas in 2018 and 2019, and upon information and belief, in 2020 and the calendar years thereafter.  They also had, have and will have the necessary funds to pay the fees, subsistence, and travel costs that are an incident of and necessary to obtain employment as an H-2A worker to work in North Carolina, subject to the reimbursement requirements of both federal and state law.

40B.    On January 24, 2018, based upon JFC's December 12, 2017 application with Job Order No. 10787615 pursuant to the procedure described in 20 C.F.R. § 655.100 *et seq.*, the U.S Department of Labor ("DOL") certified JFC's need for 95 H-2A farmworkers to work from February 25, 2018 to December 15, 2018.  On January 18, 2019, based upon JFC's December 5, 2018 application pursuant to the same procedure, the U.S Department of Labor certified JFC's need for 95 farmworkers to work from February 15, 2019 to December 15, 2019.  Upon

information and belief, the Defendants will apply for and obtain materially identical DOL certifications in 2020 and the years following 2020.

40C.    In or about January 2018 and again in or about January 2019,  JFCfiled Petitions for Nonimmigrant Worker Forms I-129 in the United States with the USCIS in which the Defendants specifically chose to deny the Plaintiffs rehiring for H-2A employment by the Defendants in 2018 and again in 2019.  Upon information and belief, the Defendants will do so again in 2020 and the years following 2020.

40D.    In 2015, 2016, 2017, 2018 and 2019 and, upon information and belief, in the years after 2019, JFC had, has, and will have one or more agent(s) acting under the control or at the direction of JFC, both in the United States and in various areas in Mexico, to assist those workers  who  JFC wanted to hire or re-hire to work for JFC under the H-2A program.  In and around the Mexican state of Tlaxcala, JFC and its H-2A worker employment and hiring coordinator in North Carolina, Heather Register, worked with an attorney or *licensiado* with an office in Tlaxcala whose surname is Gonzalez Solis.

40E.    Early in each of those same years before 2020, Ms. Register electronically sent Mr. Gonzalez Solis and other agents like him a list of the names of the Mexican nationals residing in the geographic area proximate to the location of each such agent  who JFC wanted to employ as H-2A workers under the H-2A program for that year.  Upon information and belief, that list specified the date on which the Defendants wanted each such worker named on the list to start H-2A work each year for JFC.  At various stages after she originally sent that list to Mr. Gonzalez Solis and other agents like him, Ms Register communicated to them  any changes in the information on the list.

- 18 -

40F.    Mr. Gonzalez Solis and other agents like him used that list to notify those persons named on the list to report to their respective offices in order to pay the H-2A visa registration fee charged by the U.S. Consulate, deliver the prospective worker's Mexican passport to the agent, sign the JFC H-2A job contract r, and to complete the online DS-160 forms with the assistance of the agent. Then JFC, through Ms. Register or its agents obtained an appointment for a visa interview appointment for the worker JFC's agents later directed the worker as to the time, date and location of their visa interview JFC's agents also arranged for accommodations in a hotel in the consular city while the worker waited for his visa interview.

40G.    In late 2017, in or near Sampson County, North Carolina, the Defendants decided that they would not offer employment on JFC's operations to the Plaintiffs in 2018 or any subsequent seasons. To implement this decision in 2018 and 2019, and, upon information and belief, in the years following 2019, the Defendants, acting through their their agents in the United States and Mexico, refused to take the actions and to provide to the assistance for and to the Plaintiffs that are described in paragraphs 40, 40A, 40B, 40C, 40D, 40E, and 40F above to re-hire the Plaintiffs to work for them in 2018 and 2019. By the decisions and actions described in this paragraph, Defendants blacklisted and refused to rehire the Plaintiffs for H-2A employment, breaching JFC's 2017 contractual promise to not blacklist or in any manner discriminate against any prospective H-2A employee who had exercised any of the rights that are described in paragraphs 16 and 17A above

40H.    In Mexico, the Plaintiffs expected to earn between $2,500 and $4,000 a year, which funds were, are and continue to be inadequate to meet the basic needs of their families. The Plaintiffs desired and continue to desire employment in the United States so as to better

- 19 -

support their families, including earning funds sufficient for their children to attend school and their family members to obtain needed medical care.

41.     JFC routinely recruits and rehires for employment in subsequent seasons those H-2A workers who have performed well on the farm's operations, as had the Plaintiffs during the 2017 North Carolina vegetable season.

41A. Upon information and belief, In late 2017, Defendants determined to blacklist Plaintiffs and not rehire them for any subsequent contract years, and  to exclude them from the list of nonimmigrant workers submitted to the USCIS n the United States before March 20, 2018.

42.     After the Plaintiffs communicated directly with JFC's H-2A Coordinator Heather Register between the first of March 2018 and April 26, 2018 inquiring as to whether they would be re-hired by JFC for employment during the 2018 agricultural season,, Ms. Register, acting as the authorized agent for JFC, individually notified each of the Plaintiffs that their H-2A contracts with the company would not be renewed and that they would not be rehired for work in the 2018 North Carolina vegetable harvest because the Defendants did not intend to hire the same number of H-2A employees in 2018 as it had in 2017.  At or shortly before the various dates on which this notification was given to each of the Plaintiffs, each of the Plaintiffs applied for H-2A employment with the Defendants in 2018 in the same way that he had applied  in 2017 and in the years before that – by direct oral communication with the Defendants' agents in Mexico.  After confirming that this  explanation for not rehiring them was not accurate, the Plaintiffs filed a retaliation complaint with the North Carolina Department of Labor, in or about July 2017.   On February 11, 2019, the agency issued a right to sue letter pursuant to N.C.Gen.Stat. § 95-242(c) to each of the Plaintiffs.  The February 11 letters authorized Plaintiffs to bring a claim under the REDA against the Defendants.  Copies  of those letters  are attached.

43.     Through their attorney, on February 26, 2019, each of the Plaintiffs made a written

application  for H-2A employment with the Defendants for the H-2A jobs that the Defendants had

available for the  2019 agricultural season.  Despite these applications, the Defendants refused to

rehire the Plaintiffs for employment during the 2019 North Carolina vegetable, melon or tobacco

harvesta.

44.     Because they were not rehired by the Defendants for work in either the 2018 or 2019

North Carolina agricultural seasons, the Plaintiffs, their spouses, and their children have endured

and will continue to endure financial extreme hardship.

**Retaliation, discrimination and blacklisting**

45.     The Defendants' discrimination, blacklisting, and retaliation against the Plaintiffs

that is described in Paragraphs 39-40 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41-43, , and 47 of the

Amended Complaint resulted solely from the Plaintiffs' good faith exercise of their rights under

the OSHANC, and N.C.Gen.Stat. §§ 95-78, 95-81, and95-241(a)(1)b., 95-241(a)(2), and 95-

241(a)(3) as members of a union to collectively provided information to JFC regarding its

noncompliance with the provisions of the OSHANC and the 29 C.F.R. §1928.110(c)(1)(i)-(ii)

requiring the provision of cool drinking water at open air agricultural worksites.

45A.    In the first alternative, the moving cause for the Defendants' blacklisting and

retaliation against the Plaintiffs that is described in Paragraphs 39-40, 40A, 40B, 40C, 40D, 40E,

40F, 40G, 41-43, and 47 of the Amended Complaint was f the Plaintiffs' collective exercise of

their rights as union members under the North Carolina Right to Work statute and/or

N.C.Gen.Stat. §§ 95-241(a)(1)b., 95-241(a)(2), and/or 95-241(a)(3).  In the second alternative, a

determining or motivating factor in the Defendants' blacklisting and retaliation against the

Plaintiffs that is described in Paragraphs 39, 40, 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41-43, and

47 of the Amended Complaint was because of the Plaintiffs' collective exercise of their rights as union members under the North Carolina Right to Work statute and/or N.C.Gen.Stat. §§ 95-241(a)(1)b., 95-241(a)(2), and/or 95-241(a)(3).

45B.    The exercise of the rights described in paragraphs 45 and 45A above is guaranteed to all workers under the OSHANC, N.C.Gen. Stat. § 95-126(b), 95-78, 95-81, 95-241(a)(1)b., 95-241(a)(2), and 95-241(a)(3). The Defendants' actions were undertaken in conscious, intentional disregard of and indifference to the rights and safety of the Plaintiffs and in violation of the public policy of North Carolina as set out in the OSHANC and N.C. Gen.Stat. § 95-78. The Defendants knew or should have known that their discriminatory and retaliatory actions were reasonably likely to result in injury, damage, or other harm to the Plaintiffs.

46.    Because the Plaintiffs had on behalf of themselves and their co-workers attempted to assert their rights under the OSHANC, N.C.Gen.Stat. §§ 95-78, 95-81, 95-241(a)(1)b., 95-241(a)(2), and 95-241(a)(3) as members of a union to have access to cool drinking water at the jobsite, as promised in the workers' job contracts and required by 20 C.F.R. §655.135(e), the Defendants discriminated and retaliated against and blacklisted the Plaintiffs as described in Paragraphs 39-40, 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41-43 and 47 of this Amended Complaint. These actions by the Plaintiffs were either the sole  or at least a motivating or moving factor in the Defendants' discrimination, retaliation, and blacklisting against the PlaintiffsThrough this retaliation, discrimination and blacklisting, the Defendants violated the H-2A regulations' prohibitions on unfair treatment, 20 C.F.R. §§ 655.135(h)(5) and 29 C.F.R. § 501.4(a)(5), incorporated into the Plaintiffs' employment contracts.

47.    A moving or motivating factor for the Defendants' discrimination, retaliation, and blacklisting against the Plaintiffs as described in Paragraphs 39-40, 40A, 40B, 40C, 40D, 40E,

- 22 -

40F, 40G, and 41- 43 was  the Plaintiffs' exercise of their rights under the OSHANC and

N.C.Gen.Stat. §§ 95-241(a)(1)b., 95-241(a)(2), and 95-241(a)(3).   The Plaintiffs' exercise of

their rights under N.C.Gen.Stat. §§ 95-78 and 95-81 to become and  and remain members of

FLOC and to present as union members to the Defendants the collective grievances described in

paragraphs 34-39 above was either the sole or the moving or motivating cause for their

disciplinary work suspension by the Defendants on November 8, 2017, and the Defendants' later

blacklisting and retaliatory refusal to re-hire the Plaintiffs for H-2A employment s in the 2018

and 2019 agricultural seasons and, upon information and belief, in later agricultural seasons.

48.     In their actions as described in Paragraphs 39-40, 40A, 40B, 40C, 40D, 40E, 40F,

40G, and 41- 43, and 47 above, the Defendants knew or showed reckless disregard for  whether

their conduct was prohibited by the REDA.

VII.     <u>FIRST CLAIM FOR RELIEF</u> (REDA)

49.     As alleged in Paragraphs 34 through 40, 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41-

43, and 45 through 48, the Defendants have unlawfully blacklisted, discriminated and retaliated

against the Plaintiffs in moving or motivating part because they exercised their statutory rights

under N.C.Gen.Stat. §§ 95-78 and 95-81 as members of a union to act collectively present

complaints and to provide information to the Defendants with respect to their violations of

OSHANC's regulatory requirements relating to provision of drinking water at agricultural jobsites.

49A. In the alternative, as alleged in Paragraphs 34 through 40, 40A, 40B, 40C, 40D, 40E,

40F, 40G, 41-43, and 45 through 48, the Defendants have unlawfully blacklisted, discriminated and

retaliated against the Plaintiffs in sole, moving, or motivating part because they exercised their

statutory rights under REDA to present complaints and to provide information to the Defendants

regarding health and safety conditions on the jobsite.

49B.    In the second alternative, as alleged in Paragraphs 34 through 40, 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41-43, and 45 through 48, a motivating or moving factor for the Defendants' blacklisting, discrimination and retaliation against the Plaintiffs was their exercise of statutory rights under the OSHANC and the REDA to present complaints and to provide information to the Defendants regarding health and safety conditions on the jobsite.

50.    The Defendants' actions complained of in this claim were taken in willful and deliberate disregard of the Plaintiff's rights under and in violation of N.C.Gen.Stat. §§ 95-241(a)(1)b., 95-241(a)(2), and 95-241(a)(3) of the REDA and N.C.Gen.Stat. §§ 95-126(b)(1), 95-126(b)(2)a., 95-126(b)(2)b., 95-126(b)(2)d., 95-126(b)(2)g., 95-126(b)(2)h., 95-126(b)(2)i., and 95-155 of the OSHANC.

51.    The Defendants' actions complained of in this claim were taken with willful intent to discourage and impede the Plaintiffs' exercise their statutory rights under N.C.Gen.Stat. §§ 95-78 and 95-81 as members of a union to collectively enforce their rights under the OSHANC to a healthy and safe workplace.

52.    As a result of the Defendants' intentional, deliberate, and willful actions, the Plaintiffs have suffered damages, and are entitled pursuant to N.C.Gen.Stat. §243(c) tp recover three times the wages that they have lost as a result of the Defendants' willful, discriminatory, and retaliatory their suspension without pay on November 8, 2017 as described in Paragraph 39, and the Defendants' retaliatory and discriminatory denial of employment in the 2018 and 2019 North Carolina agricultural seasons, and in the agricultural seasons following 2019 as described in Paragraphs 40, 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41- 43, and 45-47 above.

VIII.    SECOND CLAIM FOR RELIEF (N.C.Gen.Stat. §§ 95-78, 95-81, and 95-83)

53. N.C.Gen.Stat. §95-78 expressly declares that it is ". . . the public policy of North Carolina that the right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization or association."

54. The moving or motivating cause for the Defendants refusal to re-hire the Plaintiffs for the 2018 and 2019 North Carolina agricultural seasons, and, upon information and belief, in the seasons following 2019, was and will be based on their membership in FLOC, as set out in Paragraphs 34- 47 above. The moving or motivating cause of the Defendants' blacklisting of the Plaintiffs was and will be intended to discourage the Plaintiffs' and other H-2A workers' membership in FLOC and to chill workers' exercise of the rights provided by N.C.Gen.Stat. §§95-78 and 95-81.

54A. In the alternative, as alleged in paragraphs 39, 45, and 47 above of the Amended Complaint , the sole cause for the Defendants' blacklisting, discrimination and retaliation against the Plaintiffs was because they exercised their statutory rights under N.C.Gen.Stat. §§ 95-78 and 95-81 to join and act as members of a labor union.

55. The Defendants' one-day suspension of the Plaintiffs without pay as described in Paragraph 39, and the Defendants' retaliatory and discriminatory denial of employment in the 2018 and 2019 North Carolina agricultural seasons, as described in Paragraphs 40, 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41- 43, and 45-48, were in violation of the provisions of N.C.Gen.Stat. §§ 95-78 and 95-81. The Defendants undertook these actions with the willful intent to discourage and impede the Plaintiffs' efforts to exercise their rights to membership in a labor union under North Carolina's right to work statutes, N.C.Gen.Stat. §§ 95-78 and 95-81.

56. As a result of the intentional, deliberate and willful actions of the Defendants as described in Paragraphs 34 through 39, 40, 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41-43, 45

- 25 -

through 48, and 53 through 55, the Plaintiffs have suffered damages, and are entitled to compensation for lost wages, emotional distress and mental anguish suffered as a direct and proximate result of the Defendants' wrongful and retaliatory refusal to rehire them as H-2A workers in violation of N.C.Gen.Stat. §§ 95-78 and 95-81. Each Plaintiff is due compensation for those damages in an amount to be determined by a jury but equal to at least $26,000 for total lost wages in 2018 and 2019, emotional distress damages to be determined by the jury but at least $30,000, and punitive damages in an amount to be determined by a jury but in an amount at least equal to the amount awarded for economic losses pursuant to N.C.Gen.Stat. § 95-243(c)(4) is trebled pursuant to N.C.Gen.Stat. § 95-243(c).

IX.    <u>THIRD CLAIM FOR RELIEF</u> (Breach of Job Order Contract)

57.    The 2017 job order and temporary labor certification application by JFC served as the Plaintiffs' employment contract during the time they worked on JFC's operations during the 2017 North Carolina vegetable season., in accordance with 20 C.F.R. §655.122(q).

58.    The contract described in Paragraph 57 contained an express assurance by Defendant JFC that during the period of the Plaintiffs' employment and in the future with respect to the possible rehire of the Plaintiffs in subsequent agricultural seasons, JFC promised that it would not blacklist or discriminate against any H-2A worker that it employed in 2017 for his exercise of any rights that he had under applicable Federal, State and local employment-related laws and regulations, including employment-related health and safety laws, during the time period of the Plaintiffs' H-2A employment in 2017. Federal regulations require that this assurance from all H-2A employers. 20 C.F.R. §§ 655.135(e) and 655.135(h)(5).

59.    Through their actions described in Paragraphs 34 through 39, 40, 40A, 40B, 40C, 40D, 40E, 40F, 40G, 41-43, 45 through 48, 49 through 51, and 53 through 55, Defendant JFC

- 26 -

breached this provisions of itsemployment contract with the Plaintiffs. Among other things, Defendant JFC breached the contract's prohibition against unfair treatment by blacklisting and discriminating against the Plaintiffs because of their exercise of rights and actions protected by the statutes and regulations cited in Paragraphs 45 through 55.

60. As a direct and proximate result of the Defendant JFC's contractual breaches, the Plaintiffs have suffered damages. The Plaintiffs are entitled to compensation from Defendant JFC for their suspension feom qoek on November 8, and their wrongful blacklisting from employment during the 2018 and 2019 North Carolina agricultural seasons. The amount of compensation due the Plaintiffs from Defendant JFC for these contractual breaches is to be determined by a jury, but includes at least $26,000 for each Plaintiff's loss of employment opportunities during the 2018 and 2019 agricural seasons.

X.  CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

61. The Plaintiffs and the Defendants are in a dispute as to their respective rights, privileges, obligations, and liabilities under the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C.Gen.Stat. §§ 95-81 and 95-83
and the common law of contracts, and require declaratory relief as to whether:

(a)  the motivating or moving cause of both the Defendants' suspension of the Plaintiffs without pay on November 8, 2017 and the Defendants' blacklisting of the Plaintiffs in the 2018 and 2019 North Carolina vegetable seasons was each Plaintiff's exercise of rights protected under N.C.Gen.Stat. §§ 95-78 and 95-81;

(b)  the Defendants' retaliatory and discriminatory actions were in violation of N.C.Gen.Stat. §§ 95-241(a)(1)b., 95-241(a)(2), and 95-241(a)(3) of the REDA;

Case 7:19-cv-00090-BO   Document 11   Filed 07/23/19   Page 27 of 31

(c)     the Defendants' violations of the REDA were willful within the meaning of N.C.Gen.Stat. § 95-243(c);

(d)     the retaliatory, and discriminatory actions of Defendant JFC breached is employment contracts with the Plaintiffs;

62.     The Defendants' discriminatory, retaliatory, and wrongful blacklisting of the Plaintiffs is ongoing and causing each of the Plaintiffs irreparable harm. There are no jobs available in the area of the Plaintiffs' respective residences in Mexico that will permit them to earn on a weekly basis more than a small fraction of the wages that could be earned as an H-2A worker on JFC's operations.

63.     As a direct and proximate result of the Defendants' retaliatory and discriminatory blacklisting of the Plaintiffs from future employment on JFC's operations, the Plaintiffs and their immediate families have and will endure extreme hardship. Among other things, the Plaintiffs will lack funds to pay for their children's schooling or essential medical care for their family members.

64.     The Plaintiffs require equitable relief to compel the Defendants to return them to the H-2A temporary agricultural worker positions with JFC to which they would have been hired in 2018 and subsequent agricultural seasons were it not for the continuing discriminatory and retaliatory actions of the Defendants that are the subject of this Amended Complaint.


WHEREFORE, the Plaintiffs respectfully request that the Court:

(a)     Grant a jury trial on all issues so triable;

(b)     Declare that Defendants Jackson's Farming Company of Autryville and William Rodney Jackson have willfully violated the rights of each of the Plaintiffs under North Carolina Retaliation in Employment and Discrimination Act ("REDA"), N.C.Gen.Stat. §§ 95-241(a)(1),

95-241(a)(3), and 95-243(c), the provisions of N.C.Gen.Stat. §§ 95-81 and 95-83, and, only as to defendant Jackson's Farming Company of Autryville, the common law of contracts;

(c)  Enter judgment in favor of the Plaintiffs and against Defendants JFC and William Rodney Jackson, jointly and severally, on the Plaintiffs' First Claim for Relief, and award each Plaintiff damages for his lost wages and other economic damages resulting from the Defendants' unlawful retaliatory and discriminatory actions, including treble damages pursuant to N.C.Gen.Stat. § 95-243(c) for the Defendants' willful violations of N.C.Gen.Stat. §§ 95-241(a)(1), 95-241(a)(3), and 95-243(c), and pre- and post-judgment interest at the full amount allowed by law;

(d)  Enter judgment in favor of the Plaintiffs and against Defendants JFC and William Rodney Jackson, jointly and severally, on the Plaintiffs' Second Claim for Relief, and award each Plaintiff compensatory damages for his lost wages, emotional distress, and mental anguish resulting from the Defendants' unlawful retaliatory and discriminatory actions in violation of N.C.Gen.Stat. §§95-78, 95-81, and 95-83, including treble damages pursuant to N.C.Gen.Stat. § 95-243(c) for the Defendants' willful violations of N.C.Gen.Stat. §§ 95-78, 95-81, and 95-83, and pre- and post-judgment interest at the full amount allowed by law;

(e)  Enter judgment in favor of the Plaintiffs and against Defendant JFC on the Plaintiffs' Third Claim for Relief, and award each Plaintiff compensatory damages for his lost wages and other economic damages resulting from the Defendant JFC's contractual breaches, including pre- and post-judgment interest at the full amount allowed by law;

(f)  Award the Plaintiffs for reasonable costs and expenses, including attorney's fees pursuant to N.C.Gen.Stat. §§ 95-243(c) and 6-20;

(g) Pursuant to N.C.Gen.Stat. § 95-243(a)(1)-(3) of the REDA, enjoin Defendants JFC and William Rodney Jackson from any continued violation of N.C.Gen.Stat. §§ 95-241(a)(1) and 95-241(a)(3) and require them to reinstate each Plaintiff to H-2A employment on JFC's operations;

(h) Award such other relief as may be just and proper.

Respectfully submitted this 23rd day of July, 2019.

LAW OFFICE OF ROBERT J. WILLIS, P.A.

BY:/s/Robert J. Willis
Robert J. Willis, Esq.
Attorney at Law
NC Bar #10730
P.O. Box 1269
Raleigh, NC 27602
(919) 821-9031 telephone
(919)821-1764 facsimile
5. W. Harnett Street
Suite 404
Raleigh, NC 27601
Counsel for Plaintiffs
rwillis@rjwillis-law.com

- 30 -

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following:

Nathan A. Huff, Esq.
nathan.huff@phelps.com
N.C. State Bar No. 40626
Phelps Dunbar LLP
4140 ParkLake Avenue, Suite 100
Raleigh, NC 27612

This the 23rd day of July, 2019.

/s/ Robert J. Willis
Robert J. Willis, Esq.
N.C. Bar No.: 10730

- 31 -